District Court should be reversed because it erred in two material ways. First, the District Court erred in limiting the scope of paragraph 5 of the party's settlement agreement to cover only coin sorters that permit coins to flow from a first coin tube to another in a manner that's commercially usable. And then the District Court erred by applying that limited provision to rule that the Royal Sovereign coin sorter issue in this case does not violate this settlement agreement because it while there is the possibility that coins do flow from a first coin tube to another. Is that a malfunction? Even if it's a malfunction, Your Honor, it still permits it to flow. The malfunction is the way the Royal Sovereign has characterized the performance of its machine, but the intent of Royal Sovereign is not... They intend their machine to malfunction and infringe? Well, their intent probably most significantly is evidenced by the different machines that they have put in the market since the settlement agreement was executed. The first machine fell within a safe harbor provision of settlement agreement. Obviously, coins could not flow from a first coin tube to another because there was one row of coin tubes. The second machine, though, is the most significant. It was the FS2. It contained two rows of coin tubes with two coin tubes corresponding to each denomination. The second row of coin tubes was at an elevation higher than the first coin tube, row of coin tubes, and so it did not permit, it did not allow coins to flow from the first coin tube to another. Royal Sovereign intended to change that design. It placed the coin tubes at a second row, the subsequent rows at a lower elevation, and instead rely on a coin counting mechanism to prevent coins from flowing from a first coin tube to another. So to the extent that they are saying they did not intend, or I think the phrase they use is a good and useful coin sorter, but it is not perfect. The FS2 was perfect in the sense of Paragraph 5 of the settlement agreement. They intended to change that design and place that into the marketplace. So it's a magnificent position that, yes, they intended this to happen, and they had the opportunity to not have it happen, and they left that aside and moved forward with the FS3, 3D, which is in violation of Paragraph 5. You make a decent argument that this report, in imposing this commercially usable limitation, wasn't correctly interpreting the settlement agreement, but your opponent suggests the word flow, which is in there, suggests something more than an occasional misfire. It suggests a smooth flow of coins from one place to the other. I noticed that in your reply brief, you don't spend much attention to that particular construction, but so my question is, why isn't that construction correct, that flow requires sort of a continuous flow of coins from one to the other, and that that doesn't happen here? Certainly, you're correct. We did not spend much time on our reply, so I would like to address that now. The gist or the primary definition that Royal Sovereign has offered, I believe it was on page 16 of the red brief, is that flow means to move with unbroken continuity. With the FS3D, Magnus suggests that coins do flow with unbroken continuity. There is nothing in the design or the configuration of the FS3D that would break the continuity of the path of a coin. If you take the FS2, the prior machine, the second row coin tube to act as a and you take the second part of that definition, continuity implies that a coin is continuing from the coin chute to a first row of coin tubes to its next row of coin tubes. So coins are not effectively prevented, that is, they are allowed... Well, it's not, the agreement's not talking about one coin, it's talking about coins generally flowing. Correct. And the contention is that there is not a flow of coins generally, it's just that every once in a while there's one coin that ends up in the other two. I believe that the argument that Royal Sovereign has put forth is too restrictive. There's no quantity limitation on the number of coins that must quote-unquote flow. There is, the only indication on that is that coins is listed as a plural, meaning more than one. I would suggest that under any of the definitions suggested for flow, that coins, more than one coin, will flow from a first coin tube to a second coin tube. A single drop or two drops of water on a windshield of a car will flow down the windshield. You don't need six drops or a thousand drops, just as you don't need a specific number of coins except for more than one to flow from a first coin tube to another. In each instance in the record where the machine has been demonstrated in the report of Magnus Expert, when Magnus Expert operated the machine at the hearing, and in fact when Royal Sovereign's own general manager operated the machine at the hearing, more than one coin was permitted to flow from a first coin tube to another coin tube. And that constitutes a material breach of the settlement agreement, paragraph five in particular. With respect to the district court's limitation, the court went beyond what the parties had agreed that the settlement agreement is clear and unambiguous. And the notion that you've raised with respect to flow goes directly towards the commercially usable limitation of the district court included. The words commercially usable do not appear anywhere in the settlement agreement at all. It's contrary to the actual language of paragraph five, which refers to any coin sorting apparatus that permits coins to flow, not just those that permitted in a commercially usable manner. And the district court's question raised is, how many coins have to flow for it to be deemed commercially usable? Whose intent or whose perception of commercially reasonable is important? The district court never answered those questions and never provided any guidance to the parties on how they should apply that, because really the first time that it was suggested was in closing argument by Royal Sovereign, and then sort of clarified and explicated in the opinion. Isn't the point here though that your device has a feature, a very attractive feature, that fills one coin tube very continuously after the next coin tube and thus increases the capacity of the machine? And that's clearly not what's I would suggest to you that the record evidence actually shows just the opposite. In Royal Sovereign's own response brief at pages three to four, they acknowledge that when the FS3D is operating a certain way, it will misdeliver a large number of coins, some of which fall into the adjacent tube. That plays directly with what this settlement is directed to. It's directed towards a coin sorter and not a coin counter. Royal Sovereign's witness acknowledged you don't even need to use coin wrappers with this machine. For the sorting function, for separating large quantities of coins into separate denominations, the overflow feature of the FS3D is something that is desirable and useful. It can perform that function, rapidly sorting coins. Occasional coins get into the second tube, but that doesn't mean that the second tube serves as a backup to the first tube. The idea is to fill each tube, remove it, and then put the backup into place. That is a use for the machine, but it's certainly not the only use for the machine. And merely moving the coin tube after it has stopped will allow coins then to not only fill the first coin tube, but to fill a second and to keep on going in large quantities. The machine does not always stop at that one point. It is definitely a feature that can be used for that purpose. And at the end of the day, the commercial usability, the commercial acceptance, or anybody's intent for this is a very clear, definitive, unambiguous contractual provision where the parties agreed to a certain set of rules in settling a patent dispute. Royal Sovereign agreed to not sell any coin sorting apparatus that permitted coins to flow from a first coin tube to another. Not just that ones did it in a commercially usable way, not just ones that didn't permit 10 coins or 100 coins to do it. It was a bright line standard that was agreed to by the parties. It was a bright line standard that Magnet accepted as a primary consideration in lieu of monetary compensation to settle this case. And strict enforcement of that provision is required to give full purpose and effect to the parties' settlement agreement as  You're into your rebuttal time, Mr. Mone. You have no more questions, I'll reserve the room. Thank you, Mr. Pritchard. May it please the court. On this appeal, Magnet is really attempting to make random, unpredictable, and very occasional malfunctions by Royal Sovereign FS3D in a settlement into a breach of the parties' settlement agreement. The district court found no breach because the phenomenon alleged to be a breach simply didn't fall within any reasonable interpretation of paragraph 5 of the settlement agreement. Magnet's argument is that the district court added a commercially useful criteria because, he said, the criteria is not commercially useful. Our position is the district court didn't add anything. Judge Mattea was simply saying that the accused behavior of the FS3D isn't within a reasonable interpretation of the settlement. Under any reasonable interpretation, the FS3D does not permit coins to fall from the first coin to the second other coin to, in a commercially reasonable manner, or otherwise. The facts aren't disputed. The FS3D only delivers coins to the row of coin tubes that's positioned immediately below the ramp from which the coins exit, except if there's a random and unpredictable malfunction, which happens only a fraction of a percentage of the time, or when human intervention intentionally forces the machine to operate the machine in such a way that you put a full tube where an empty tube ought to be, and then pull the machine into thinking there's an empty tube there by bypassing the sensor and pulling it out again quickly. Isn't it true that Magnif's experts themselves called this a malfunction? Yes, he did. He didn't call it an infringement or a flow. He said it was a malfunction. He didn't. His position was that if one coin out of 100,000 ends up in a different tube than it's supposed to be delivered to, then the machine permits coins to flow from the first coin tube to the second coin tube, and I just don't think that's correct. The correct way to look at this language is first consider the language, and second, consider the context. It doesn't permit the coins to do it because the machine's not designed to do it, and it doesn't do it automatically at all. The only way to get any significant number of coins in the wrong tube is to fool the machine and misuse it intentionally, and the word flow is important and has to be taken into account. Flow means a continuous movement of the coins from one tube into another, and I think the use of figure 11 of the patent as an example in the settlement agreement reinforces that. What figure 11 of the patent shows is that in a patented device, once tube 1 gets full, the coins come out of the chute, slide over the top of the second chute, and automatically in a continuous stream flow into the next tube. What happens in Dr. Prahl's trick is when the coins come out of the chute and encounter a full tube here, they have nowhere to go in the tube, so they bounce around. Some end up in the front up here, and some may go into the next tube, but it's by no means a flow. It's random and unpredictable. The main point is no one would buy the FS3D if he wanted a machine that did what the magnetic machine does, and in addition to the language, the context in which the parties entered into the settlement agreement needs to be considered. It was a patent infringement case, and basically it was an agreement not to sell a machine that did what the patent machine did, whether or not it infringed the patent. There might be other ways to devise a machine that permitted the coins to fill a first tube and then fill a second tube reliably so that that could be part of the functionality of the machine. Ross Auburn agreed not to do that, and I think that we did not do that. I just want to spend a brief minute on the alternative grounds that we argued in our brief could support the district court's decision in the event that the court should find error in what the district court did. First, the counter-proferendum argument. The record establishes that the operative language of paragraph 5 of the settlement agreement was drafted by Magnus and put forward by Magnus, and under Ohio law, that should therefore be construed against Magnus. If there's ambiguity, and of course we say there's no ambiguity, Magnus says there's no ambiguity, but yet we both think that the unambiguous meaning is different. Well, it does under Ohio law. Under the most recent Ohio law case that we cited in our brief, it was applied where the entities were sophisticated. That would be the Meade case, which was a federal case, and Graham against Drydock Coal. There have been some Ohio cases, some appellate cases, that have not applied where there are sophisticated parties, but the rule in Ohio, as I understand the cases, is that it can be applied in an appropriate circumstance. And I think this is an appropriate circumstance, partly based on the next ground that we urge, which is that the agreement is in restraint of trade, and therefore should be narrowly construed. There's no question that this agreement restrains royal sovereignty from putting out a certain type of machine, and that the construction that Magnus wants to put on it, if not outside of the feasible construction, as we contend, is a bit very out of limits. And for purposes of public interest, I submit that there should be a reasonably narrow construction so that a machine that's useful, useful to consumers at its price point, even though it isn't perfect, and doesn't really impinge on demand for Magnus' machine, which fills a tube and then fills another tube, ought not be taken off the market under an interpretation of a settlement agreement. And finally, we raise a de minimis argument that even if random misfirings into another tube constitute breach of the settlement agreement, it's a de minimis breach and should be beneath the notice of the law. The court has no further questions. Thank you. Thank you, Mr. Krugman. Mr. Mobius, you have four and a half minutes remaining. There's a couple quick points, if I may. Royal sovereign talks about the purpose of the contract and has characterized it as a promise not to sell a machine that had certain features of a Magnus machine. That statement of purpose is nowhere in the record. It has nowhere been developed in the evidence. In fact, the preamble to the party's agreement just merely refers to it being an attempt to resolve the action without further litigation. The Markman hearing had been held in this case, but there had been no ruling. The parties in this settlement agreement defined the specific class of covered coins precisely because there were claim terms at issue and in dispute, and they did not want there to be any question. It was desired to be a bright-line standard. So to say that it's contrary to the intent of the agreement is just simply not supported in the record. Second, to suggest that the usefulness to consumers has been established as nonexistent because it's a misfire or a trick also is not in the record evidence. The record evidence that I have pointed to shows that when the machine is used in an expected way, coins will issue from it and flow in a significant manner from one coin to the next in the sorting function. But there's been no evidence on consumer acceptance of this, the desirability to consumers. In fact, the district court judge refused to take any testimony referring to damages, which would have shown commercial success or acceptance by customers. That evidence just simply isn't in the record. It's merely based on the supposition of counsel. With respect to Magnus' expert referring to the phenomenon as a malfunction, his exact testimony on that was to characterize it as a, quote, malfunction of design. The design of this machine is something that was conceived of and put into practice by Royal Sock. It was their intent to place this machine in the market. It was their intent to change the design of the FS2. Page 111. I guess I would call that a malfunction of that apparatus. I mean, it has to accept the possibility of that happening and deal with it. It happened infrequently, but it still doesn't call it a malfunction. I refer you to page 112. Well, this is testimony on the record, isn't it? Correct. And then he called it a malfunction of that apparatus. And further, two pages later in his testimony, if you refer to page 112, is where he clarifies that as a malfunction of design, which is the design of— Well, he doesn't really clarify it. He goes on to call it something else as well. That's a malfunction in design. But he, at least at one point, refers to it very clearly as a malfunction of that apparatus. That is something that has to be anticipated and should have been anticipated and was, in fact, known to royal sovereign because of their instruction manual. In the caution, in the warnings, I think the second page of the instruction manual says that because pennies and dimes are very close in size and thickness, they may sometimes sort into opposite tubes. That's page 10 of the supplemental appendix. This is something they anticipated. They understood that the design of the FS-3 was defective, whether it's the intent for this to happen or whether it's the intent of the coin counter or how it should work. This was known and this was foreseeable. The previous machine on the market, the FS-2, was designed intentionally to have a second row of coin tubes at a higher elevation that would not permit coins to flow from a first coin tube to a second coin tube. They changed their design, eliminated that design feature, and must be held accountable for that. To merely come into the court and say we didn't intend for this to happen is not a sufficient excuse. Ohio law does not recognize any sort of separate tort for an unintended or mistaken breach of contract. A contract is what it is and is either followed or it is not. Royal Sovereign's definitions go even further, though, and say that there has to be an intent. That's beyond what the district court said. They're urging an affirmance on a ground that would expand their rights. They did not cross appeal and to affirm on that basis should be precluded for failure to preserve that at the district court level and for failure to cross appeal. So the question is whether or not the district court properly construed the contract and whether the evidence shows that the FS-3D is in breach. And we submit that it is. Thank you, Mr. Mulvey. All rise. The Honorable Court is adjourned until 10 o'clock tomorrow morning.